Christian, J.,
delivered the opinion of the court.
Newton Smith was indicted by a grand jury of the Corporation court of the city of Alexandria, on the 16th day of January 1871, for the murder of the infant child of one Harriet Ferguson. At the February term of said court he was found guilty of murder in the first degree, and was.sentenced to be hung on the 21st day of April 1871. A writ of error to that judgment brings the case before this court. The first error assigned, in the petition for a writ of error, and insisted upon here, is that the court overruled the prisoner’s demurrer to the indictment. The indictment contained two counts.
The first count charges the prisoner with the murder of the said infant child by drowning in a pond of water. The second count charges him with the murder of the child by placing it in a hole, in a bleak, barren and open place, and leaving it there exposed to the inclemency of the weather, by means of which exposure the child died. These two causes of death are set out with technical precision in approved forms of counts, in an indictment for murder.
It is a well settled principle of criminal pleading and practice, that several modes of death, inconsistent with each other, may be set out in the same indictment. This grows out of the very necessity of the case. The indictment is but the charge or accusation made by the grand jury with as much certainty and precision as the evidence before them will warrant. In many cases the mode of death is uncertain, while the homicide is beyond question. Every cautious pleader, therefore, will insert as many counts as will be necessary to provide for every possible contingency in the evidence. If the mode of death is uncertain, he may and ought to state it in different counts, in every possible form to correspond with the evidence at the trial as to the mode of death. The reason for this is thus clearly stated by Chief Justice Shaw in Bennis’ Webster Case, 471: “To a person *812 unskilled and unpraeticed in legal proceedings, it may seem strange that several modes of death inconsistent with each other should be stated in the same document ; but it is often necessary, and the reason for it when explained, will be obvious. A grand jury may well be satisfied that the homicide has been committed, and yet the evidence before them may leave it somewhat doubtful as to the mode of death; but in order to meet the-evidence as it may finally appear, they are very properly allowed to set out the mode in different counts; and! then if any one of them is proved, supposing it also to be legally formal, it is sufficient to support the indictment. Take the instance of a murder at sea: A man is struck down, lies sometime on the deck insensible, and in that condition is thrown overboard. The evidence proves the certainty of a homicide by the blow or by the drowning, but leaves it uncertain which. That would be a fit case for several counts charging a death by a blow, and a death by drowning, and perhaps a third alleging, a death by the joint results of both causes combined.” See also 1 Wharton’s Am. Criminal Law, and cases there cited, §§ 424, 425.
So in the case at bar, it being uncertain whether the homicide charged in the indictment was caused by exposure or drowning, it was certainly allowable to charge-both modes of death in different counts, and proof of' either would be sufficient. The court is, therefore, of' opinion that the said Corporation. court of the city of Alexandria was not in error in overruling the demurrer to the indictment.
The court is further of opinion, that the said Corporation coui’t did not err in refusing to give the instructions asked for by the prisonei'’s counsel. Some of these-instructions contain propositions which are in contravention of well settled px-inciples of criminal law ; while in others, principles of law are stated in such a manner as. *813 is well calculated to mislead the jury. The court was therefore clearly right in rejecting them.
N"or was the said Corporation court in error, in giving the instructions which it gave in lieu of those asked for by the prisoner’s counsel. These instructions comprehend in better form every one asked for by the prisoner’s counsel, which ought to have been given, and very -clearly and fairly lay down the principles of law governing such a case.
But the court is further of opinion, that the said Corporation court erred in refusing to set aside the verdict and grant to the prisoner a new trial.
The principles upon which courts are justified and required to set aside verdicts and grant new trials have been well settled by this court, and recently re-affirmed in the case of Blosser v. Harshbarger, decided at the last Staunton term.
A new trial ought to be granted—1st. Where the verdict is against law. This occurs where the issue involves both fact and law, and the verdict is against the law of ythe case on the facts proved. 2d. Where the verdict is contrary to the evidence. This occurs where the issue involves matters of fact only, and the facts proved require a different verdict from that found by the jury. 3d. When the verdict is without evidence to support it. This occurs where there has been no proof whatever of a material fact, or not sufficient evidence of the fact or facts in issue to warrant the finding of the jury. The material fact in every criminal prosecution is the corpus •delicti. Proof of the charge, in criminal causes, involves the proof of two distinct propositions; first, that the act itself was done ; and secondly, that it was done by the person charged. In murder the corpus delicti has two •components—death as the result, and the criminal agency of another as the means. It is only where the first (that is, death by criminal violence,) has beet? proved either by the direct evidence of witnesses wha *814 have seen and identified the body, or where proof of the <3eath is so strong and intense as to produce the full assurance morai certainty, that the other (the criminal agency) can be established by circumstantial evidence.In order to warrant a conviction of murder, there must be satisfactory proof either of the death, as by the finding and identification of the corpse, or of criminal violence adequate to produce death, and exerted in such a manner as to account for the disappearance of the body. 3 Greenl. Ev. § 30, note, and cases there cited.
Let us apply these well settled and humane rules of criminal law to the case before us. Harriet Ferguson lived in the Mansion House, a hotel in the city of Alexandria, in the capacity of a chambermaid. The prisoner was a servant in the same hotel. This woman gave birth to a female mulatto child on Sunday, the 4th day of December 1870. The woman is a white woman, and the prisoner is a mulatto. The prisoner admitted that he was the father of the child. On Wednesday night, the 7th day of December following, this child was delivered to Hewton Smith, the prisoner, by Martha Ferguson, (the mother of Harriet Ferguson) ; she saying that the child’s mother was not able to provide for it, and that her other daughters were not willing it should remain in the house ; and the prisoner stating- that he would have it raised by his mother, who lived some six or eight miles in the country. The child, when delivered to the prisoner, was alive and healthy, and had on at the time a flannel petticoat, a little slip, and a shirt or gown, and was wrapped up in a shawl.
About the 16th of December following, the body of a female mulatto child was found in a pond of water in the southeastern portion of the city, in the neighborhood of Gooding’s ship yard, and near the bank of the Potomac river. This child was in the water, with nothing on it but a shirt and a band around its body. The physician who made the post mortem examination, *815 expressed the opinion that the child so found was born alive, and came to its death by drowning. He also expressed the opinion that the child found was between one and six days old at the time of its death; but he expressed no opinion, nor was there any evidence in the case, as to how long the child so found had been dead. There was no evidence in the case, direct or circumstantial, independent of the admissions and conduct of the prisoner (which we shall notice presently), to prove that the child so found was the same child which was born of Harriet Ferguson, and delivered to the prisoner by Martha Ferguson. There is an entire absence of the most ordinary proof of identification by the clothing found upon the dead body. Whether that was preserved, and any effort made to identify it, does not appear in the record. Indeed, taking the facts proved (independent of the conduct and admissions of the prisoner), they rather tend to show that it was not the same child. The child delivered to the prisoner is described as a bright mulatto. It must have been at three days old almost white, the father being a mulatto and the mother white. So young a child, of such parents, would hardly be described as a mulatto. Yet this is the description given of the child found in the pond near the river—not a bright mulatto, as the child born of Harriet Ferguson was, and must have been, but simply a mulatto. The child delivered to the prisoner was dressed differently from the child found in the pond. If part of the clothing was taken off it, still there were two articles of clothing left upon the body. Martha Ferguson, who delivered the living child to the prisoner, described minutely every article of clothing it had on its person. Why was she not called by the Commonwealth to identify what was found on the body of the dead child % Again, no proof is offered to show how long the child had been dead which was found in the water. Might not that child have been dead for *816 weeks before it was found ? How long would a dead body of a child a few days old be kept in a perfect state preservation in' the month of December, in the open air, partly covered with water ? Three days or three weeks ? There is no medical testimony on this subject; and the record is silent as to the state of preservation of the body found. For aught the record shows, the child found might have been dead before the other was born. The Commonwealth might have shown, and ought to have shown, that the body found had been killed within such a recent period as to correspond with the time of the death of the child charged to have been murdered. But there was no such proof: and we are constrained to say, that independent of the admissions and conduct of the accused, there is not a particle of evidence tending to show that the body found was the body of the infant child alleged to have been murdered.
Let us now examine the facts certified in reference to the confessions of the accused. The bill of exceptions, setting forth the facts proved, concludes in these words : “He (the accused) admitted that the child found in the pond of water, in the southeastern portion of the city, was the child delivered to him by Mrs. Ferguson, only in th» manner hereinbefore stated.” Thus it is evident that the court below was unwilling to certify as a fact proved in the case, that the prisoner made a specific and unqualified admission, that the child found in the pond was the same child delivered to him by Mr3. Ferguson ; but added the wrords only in the manner hereinbefore stated. We must therefore look to the evidence of Mr. Latham, the mayor of Alexandria, as to the confessions of the prisoner, and draw our own conclusions from it. The mayor states, that about the 21st December, Dr. French, who was a physician present and officiating at the delivery of the child born ”of Harriet Ferguson, called upon him, and told him of the delivery of the •child, and gave him the name of the prisoner, who had *817 admitted to him that he was the father of the child. Mr. Latham (the mayor) sent for the prisoner. soon came into his office, and he, the mayor, then told him he knew all about Mrs. Ferguson having delivered to him the child of Harriet Ferguson, and asked him what had become of it. The prisoner said he had .taken the child to his mother’s, near Mount Vernon, and that a woman who lived with or near his mother was nursing it. The mayor then told the prisoner to go down nest morning on the steamer Arrow, and return on the same boat, and to produce the child or his mother or the nurse at the mayor’s office the nest evening ; and then dismissed him. The nest evening about 5 o’clock the prisoner walked into the mayor’s office. He was taken into the mayor’s private office, and the door locked. The mayor then asked him for the child. He said that he could not bring it—that he had not been to his mother’s. The mayor then told him he was afraid the child found near Gooding’s ship-yard was the one he had got from Mrs. Ferguson, and asked him what in the name of Heaven induced him to do such a thing. He replied he did not know why he did it; that he hardly knew what he was doing. The mayor, having heard from Mrs. Ferguson how the child was clad when she gave it to the prisoner, asked him what induced him to take the clothing off the child: to which he replied, Mr. Latham, do you think I would strip the poor little thing? The mayor then asked him where was the shawl with which the child was wrapped when delivered to him by Mrs. Ferguson. He replied that it was in the room of a servant, at the Mansion House, under the bed ; and the mayor sent for it and got it, and it was identified as the same shawl which was wrapped around the child which was delivered to the prisoner.
Certainly these admissions must produce a strong suspicion against the accused ; but we cannot say, as the court below, which heard all the evidence, could not say, *818 that there was an admission on the part of the accused, that the child found was the child of Harriet Ferguson, in the indictment with having been murdered. In the absence of proof that the body of the infant found teas the same as charged in the indictment, the confessions of the prisoner must be distinct and specific before we can say, that upon his confession, the corpus delicti is made out; or in other words, that the child found is the same which was born of Harriet Ferguson, charged in the indictment as murdered by the prisoner. His reply to the mayor’s question, What in the name of Heaven induced him to do such a thing ? that he did not know why he did it, that he hardly knew what he was doing, was not construed by the court below into an admission that he had murdered the child delivered to him, or that the child found was the same delivered to him. His reply may have had reference to his criminal intercourse with¿the mother of the child, who was a white woman (he being a negro servant), or to the fact that he had received the child and delivered it to the w’oman near the diagonal pump, with whom be said he left it for a few days before he was to carry it to his mother. His indignant denial to the mayor that he had stripped the clothing off the child, is inconsistent with the theory that his other declaration was intended as a confession that the child was the same. Certain it is, that there is doubt as to -what he meant by the expression, “ he did not know why he did it, and hardly knew what he was doing.” The court below evidently had grave doubts as to what he meant, as appears from the manner in which it cei tifies the facts proved. That court does not certify that the prisoner admitted that the body found was the body of the child charged in the indictment with having been murdered by the prisoner.
There being therefore no direct proof that the body foun d was the infant child of Harriet Ferguson, if his confession is to be relied upon as evidence to-prove that fact, it ought *819 to be certain that what he said was intended as an admission that the body found was the same child which was delivered to him. The court below has refused to certify that fact, and we cannot say, upon the evidence certified, that it was admitted by the prisoner. His failure to produce the child when the opportunity was offered him by the mayor, was certainly a strong circumstance against the prisoner; and if the corpus delicti had been established, it would have been overwhelming evidence of his guilt; but in the absence of proof of the corpus delicti, cannot be said to be conclusive. If the Commonwealth had summoned the mother of the prisoner to whom he said he had delivered the child, and she had failed to corroborate bis statement, then the evidence would have been conclusive against the prisoner ; especially if the death of the child of Harriet Ferguson had been proved. But in the absence of proof of the death of that child, and in the absence of proof of the identity of the body found (either direct or eircumstancial), such a confession as the one referred to cannot be taken as conclusive against the prisoner. The corpus delicti, or the fact that a murder has been committed, is so esseutial to be satisfactorily proved, that, in the language of Mr. Greeuleaf, “Without this proof a conviction would not be warranted, though there were evidence of conduct of the prisoner exhibiting satisfactory indications of guilt.” 3 Greenl. Ev. § 131.
Whatever may be the circumstances of strong suspicion against the accused, it would be dangerous to the last degree, to convict a person of a capital offence unless the party charged with having been murdered is proved to be actually dead, either by the finding and identification of the body, or by proof of such criminal violence as would likely produce death; and exerted in such manner as to account for the disappearance of the body. 3 Greenl. § 30; Ruloff v. The People, 18 New York R. 179.
*820 , The books furnish' many deplorable cases of the conviction of innocent persons from the want of sufficiently certain proofs of the corpus delicti. A great English judge said : “ I would never convict any man of murder or manslaughter unless the fact were proved to be done, or at least the body be found dead.” This sentiment of Lord Hale as to the importance of extreme care in ascertaining the truth of every criminal charge, especially where life is involved, may be regarded as a rule of law. This is a general rule, subject to some qualification. We do not mean to say that in everycase the body must be found, for the murderer may cast his victim into the sea, or consume the body by fire; but we mean to say that the fact of the death must be established by clear and unequivocal proof, either by direct testimony or by presumptive evidence of the most cogent and irresistible kind. The fact of the death is the fundamental and material fact to be established in every case of murder. It should be shown either by witnesses who were present when the murderous act was done, or by proof of the body having been seen dead, or by proof of criminal violence adequate to produce death, and which accounts for the disappearance of the body. Hntil this is shown the accused, under an indictment for murder, cannot be held guilty merely because he does not produce the person whom he is charged with having murdered.
In the case of Reg. v. Hopkins, 8 Car. and Payne 591, a case very similar in many respects to the case before us, where' upon an indictment against the prisoner for the murder of her . bastard child, it appeared she was seen with the child in her arms, on the road from the place where she had been at service, to the place where her father lived, about six in the, evening, and between eight and nine she arrived at her father’s' without the child, and the body of a child was found in .a tide-water, near which she must have passed in her *821 road to her father’s, but the bod} could not be identified as that of the child of the prisoner; and the evidence rather tended to show that it was not the body of such child ; it was held that she was entitled to be acquitted ; and with respect to the child which was really her child, it was held that the prisoner could not by law be called upon, either to account for it, or say where it was, unless there were evidence to show that her child was actually dead. Many similar cases might be cited, but it is not necessary to cite authority to show that in every case of homicide, the fact of the death must be proved, before any party can be convicted of the killing. It is a rule adopted in the interest and for the protection >.f human life and liberty, and. a principle that lies deep in the foundations of the criminal jurisprudence of'every civilized country.
Tuiius semper est errare in acquieiando quam in puniendo; exparte misereeordice quam exparte justitice, is the wise and humane maxim of the criminal law.
"We are of opinion that the judgment of the Corporation court ought to be reversed.
Judgment reversed.